Filed 7/29/21  In re M.G. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law, | B308706 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ERNESTO G.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK02291) |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

Ernesto G. (Father) appeals from a juvenile court order summarily denying his Welfare and Institutions Code section 388[1] petition asking the court to change an order removing his daughter, M.G., from his care and denying him reunification services. Father contends that his petition alleged a prima facie case for relief, such that the trial court abused its discretion by denying him a hearing thereon. We disagree. Considered in the context of the factual and procedural history of this case, the factual allegations in Father's petition simply do not reflect the significant change of circumstances necessary to warrant relief under section 388. Specifically, the petition describes several months of sobriety and commendable efforts to address the substance abuse issues at the heart of these dependency proceedings. But Father has a 34-year substance abuse history, during which he had other such periods of sobriety and participation in drug addiction treatment, all of which ended in a relapse. Indeed, based on one such period of sobriety and progress, the juvenile court granted an earlier section 388 petition by Father and reinstated his reunification services—only for Father to relapse approximately seven months later, further delaying permanency for his daughter. His petition offers nothing to suggest that this time the outcome will be different.

Father stresses that M.G. has behavioral issues that complicate her adoptive placement prospects, that M.G. does not

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

want to be adopted by a nonfamily member, and that the dependency proceedings have not yielded meaningful steps towards a permanent plan for M.G. after over seven years.  But the length of these proceedings is partially a problem of Father's own making.  And the difficulties facing M.G. in securing a permanent placement weigh *in favor* of her continuing to pursue legal guardianship with her current foster mother, with whom she and her sister have been placed since June 2019, rather than again attempting to reunify with Father when he had alleged nothing to suggest that such efforts will end differently than they have in the past.  Although Father's sobriety and work addressing his longstanding drug problem are commendable, the juvenile court acted well within its discretion in concluding that these efforts do not support a prima facie case for relief under section 388.  Accordingly, we affirm the juvenile court order denying Father's petition without a hearing.

## FACTS AND PROCEEDINGS BELOW

### A. *Initial Petitions Based on Substance Abuse Issues*

Father is the father of M.G. (born November 2011) and the presumed father of M.G.'s sister, S.M. (born December 2006).  In October 2013, DCFS detained one-year-old M.G., six-year-old S.M., and the newborn J.O.,[2] from their mother, E.M. (Mother) after Mother gave birth to J.O. while incarcerated for a drug-

---

[2] Only M.G. is the subject of this appeal.  J.O. was placed with her father, and jurisdiction over the child was terminated on January 11, 2016.

related offense.[3]  DCFS placed M.G. with Father and filed a section 300 petition, which the juvenile court later sustained, alleging Mother and J.O.'s father had a long history of substance abuse.  Father was nonoffending in the petition.

Several months later, DCFS filed a section 342 petition against Father alleging that his long history of substance abuse and substance abused-related criminal history, as well as his having permitted Mother to have contact with the children despite knowing of her illicit drug use, endangered M.G. and S.M. Specifically, as to Father's substance abuse and criminal history, it alleged that "[F]ather . . . has a 28[-]year criminal history of convictions including eleven convictions for possession of a controlled substance and two convictions for driving under the influence of alcohol/drugs.  In February of 2013, . . . [F]ather's Prop[osition] 36 probation was revoked due to [F]ather's failure to participate in and complete a court[-]ordered drug treatment program."  (Capitalization omitted.)

On June 6, 2014, the juvenile court sustained the section 300 petition and the section 342 petition, removed all three children from Mother's custody, and removed S.M. and M.G. from Father's custody.  S.M. and M.G. were placed in foster care.

---

[3] Mother is not a party to this appeal.  We therefore omit from our factual summary details regarding Mother's involvement in the dependency proceedings and the children's lives, except to the extent necessary to provide context for the facts relevant to Father's appeal.

## B.     *Termination of Reunification Services in 2016*

For several months thereafter, Father failed to participate in court-ordered counseling and drug programs and repeatedly tested positive for drugs.  On February 2, 2015, Father enrolled in an inpatient substance abuse program.  On February 11, 2015, however, the juvenile court found Father had made only "minimal" progress, and terminated Father's reunification services.

Father stopped visiting M.G. and S.M. in September 2015. His whereabouts were unknown during this time, and in March 2016, the court completed a due diligence search for him in anticipation of the permanency planning hearing, ultimately locating him in an inpatient drug treatment facility.  The court twice continued the permanency planning hearing to allow DCFS to continue to investigate adoptive placement options, as the children's current foster family was not interested in adoptive placement.  Father resumed his visits with the children in July 2016.  By August 2016, DCFS had located a potential adoptive family.

## C.     *Father's First Section 388 Petition*

On August 5, 2016, Father filed a section 388 petition asking the court to change its February 2015 order to the extent the order terminated his reunification services for M.G. and allowed him only monitored visits with M.G. (the first section 388 petition).  The petition was based on Father's progress dealing with his addiction and his relationship with M.G.  The petition evidenced his enrollment in an inpatient drug program since February 15, 2016, which he was scheduled to complete in the coming weeks.  As detailed in the petition and supporting documentation, Father was doing well in the program, had

participated in chemical dependency education classes, relapse prevention classes, anger management classes, and 12-step meetings with a sponsor. Also attached to the petition were results of clean drug tests beginning in March 2016. The petition acknowledged that Father did not have stable housing, but alleged that the requested relief would be in M.G.'s best interest because she deserved to be with her biological father and was very attached to him.

In November 2016, the juvenile court held a hearing on the first section 388 petition. DCFS reports submitted in connection with the hearing reflected that Father was doing "well" in the second phase of his drug treatment program, continued to participate in programs, had moved into a sober-living home, was working at a warehouse, and had been consistently providing clean drug tests for approximately eight months. Father's sponsor reported Father was in his fifth step of the 12-step program and was expected to complete the program in two months.

DCFS further reported that the children had been re-placed with their potential adoptive parent in October 2016, and were adjusting well. Although the potential adoptive parent continued to express interest in providing the children with a permanent home, she was concerned about M.G.'s troubling behaviors and the availability of services to address them and M.G.'s related diagnosis of "reactive attachment disorder." (Capitalization omitted.) In November 2016, M.G. reported that she liked living with her prospective adoptive parent and wanted to stay with her, but that she also wanted to live with Father.

In November 2016, in accordance with DCFS's recommendation, the juvenile court denied the first section 388 petition.

### D. *Father's Second Section 388 Petition and Reinstatement of Reunification Services*

Less than two months later, Father filed another section 388 petition based on his continuing progress in drug treatment, his continued sobriety, and his relationship with M.G. (the second section 388 petition.)  The court twice continued the hearing on the second section 388 petition, as well as the hearing on a similar section 388 petition filed by Mother and the permanency planning hearing.  On March 17, 2017, the court granted both parents' section 388 petitions, reinstating family reunification services for both, granting them unmonitored visits, and taking the permanency planning hearing off calendar.  The court ordered the parents to participate in individual counseling, a 12-step program, and random on-demand drug tests.

### E. *Father's Progress Following Reinstatement of Services*

The months that followed were marked by positive progress for both parents and their relationships with the children.  S.M. and M.G. appeared to look forward to the unmonitored visits with both parents that began in March 2017, reported they enjoyed seeing their parents, and had no concerns regarding the visits.  On August 1, 2017, the children were released to Mother's custody.  Father resided at a sober-living residence after graduating from his inpatient program, was employed full time as a butcher, and began working with DCFS to secure housing assistance.  Between May and September 2017, he drug-tested

7

negative seven times and missed one drug test. He continued to attend Narcotics Anonymous meetings. On September 25, 2017, the juvenile court ordered the children be placed with Mother.

### F. *Father's Relapse and Termination of Reunification Services in 2018*

In October 2017, however, Father relapsed and was terminated from his sober-living facility. After leaving the sober-living home, he became homeless. He stopped visiting the children regularly, failed to make himself available to meet with the social worker, and did not follow through on efforts to secure housing benefits. When the social worker was able to contact him in February 2018, he agreed to drug test on demand and meet with the social worker again, but then failed to do either. In a March 2018 report, DCFS recommended terminating juvenile court jurisdiction with a family law order granting Mother full physical custody, joint legal custody with Father, and monitored visits for Father.

DCFS's recommendation changed, however, based on subsequent developments involving Mother and her husband, Bobby. The juvenile court continued proceedings several times while DCFS investigated various referrals involving Mother and Bobby. Ultimately, on July 30, 2018, DCFS filed a section 342 petition that alleged domestic violence between Mother and Bobby in the children's presence and physical abuse of M.G. by Mother, which the juvenile court ultimately sustained. DCFS again placed the children in a foster home. As of August 2018, Father reported still being homeless, and told social workers he was aware that Bobby was hitting Mother, but that he had never seen Mother hit M.G. Father said he wanted to reunify with the children.

At the disposition hearing on October 31, 2018, the juvenile court denied further reunification services to both parents, ordered assessment of additional relatives with which the children might be placed and ordered monitored visits for the parents.

### G. *Father's Return to Treatment, Relapse and Arrest in 2018/2019*

Father returned to an inpatient treatment program, but was discharged in approximately May 2019 due to "behavior reasons." Father also stopped contact with social workers. On August 9, 2019, Father was arrested for possession of a controlled substance for sale, and was incarcerated.

### H. *M.G.'s Foster Placements and Behavioral Issues*

Meanwhile, the children were in the care of various foster parents. Around October 2018, it was reported that M.G. was receiving wraparound services to address several behavioral difficulties, and that her behavior had improved. On January 8, 2019, M.G. was moved to a different foster home—her eighth placement—and separated from S.M. While living there, she was doing well overall at school, but experiencing incidents of bed-wetting. Around May 2019, the caregivers of both children asked that, due to ongoing negative behaviors, they be moved to new placements.

On June 12, 2019, DCFS was able to place both the children together in the foster home of T.R., with whom, based on the most current information in the record, the children appear to still be placed. T.R. expressed her desire to provide permanency through legal guardianship, but DCFS continued to recommend adoption as the permanent plan. The permanency planning

hearing was repeatedly continued while DCFS investigated possible permanent placements or family placements for the children, including with the maternal grandfather, who had been visiting with the children and had expressed a desire to adopt them. DCFS assessed maternal grandfather's home for placement, but he was denied due to maternal grandmother's criminal history. Maternal grandfather appealed the denial. DCFS reported the children were adjusting well in T.R.'s home, but neither girl was doing well in school, and M.G. continued to have incidents of bed-wetting and other behavioral issues. M.G.'s therapeutic behavioral services were discontinued in June 2019 due to improvements in her behavior at that time. She continued to receive wraparound services and individual counseling and was taking prescribed psychotropic medication under the supervision of a psychiatrist.

## I. *Continuing Efforts to Identify a Permanency Plan*

On June 26, 2019, the juvenile court ordered a planned permanent living arrangement in long term foster care, with a specific goal of adoption, as the permanent plan for M.G.

On January 13, 2020, the juvenile court changed M.G.'s permanent plan. It provided, without further specification, that "[t]he [p]ermanent plan of to be determined as a specific goal is appropriate and is ordered as the permanent plan."

In early 2020, M.G. repeatedly made accusations that foster mother T.R. had physically and verbally abused her, which M.G. later admitted was not true, and instead motivated by a desire to be placed with maternal grandfather, whose appeal regarding his failed home assessment was still pending. Despite these issues, T.R. continued to express her desire to provide

10

permanence for both M.G. and S.M. through a legal guardianship. DCFS continued to recommend adoption. Due to M.G.'s behavioral issues, however, DCFS was having difficulty matching her with an adoptive family. This difficulty was exacerbated by the children refusing to cooperate in efforts to seek adoptive placement. They stated they were not interested in being adopted by strangers and wanted to instead be adopted by maternal grandfather.

In April 2020, in response to the Covid-19 pandemic and related state of emergency, the juvenile court ordered the pending hearings, including the permanency planning hearing, continued.

### J.  *Father's Third Section 388 Petition*

In October 2020, Father filed another section 388 petition with respect to M.G. only (the third section 388 petition). Father sought to modify the October 2018 order terminating Father's reunification services, affording him only monitored visits, and requiring M.G. remain suitably placed. In the third section 388 petition, Father alleged that the following circumstances reflect significant changes warranting his requested modification: "Father has continued to actively address the issues that brought this matter before the [c]ourt. He is focused on his sobriety. He is attending an outpatient program at LaCada and has had negative drug tests. At LaCada he is involved in individual counseling, crisis intervention and case management three times a week. Since COVID he has only been able to speak with [M.G.] via telephone. Father has housing and support from his sister." According to a September 2020 letter from LaCada attached to the petition, Father had enrolled into this outpatient program on May 21, 2020, provided six negative drug tests, shown positive

11

progress, and appeared to be motivated to continue the program. He was participating in weekly telephonic individual therapy sessions, had attended four group sessions, 24 substance-use counseling sessions, and four individual therapy sessions.

The petition asked the juvenile court to place M.G. in Father's custody or reinstate family reunification services and and/or liberalize restrictions on his visits. The petition alleged the requested relief would be in M.G.'s best interests because she "deserves to be able to bond with her father" and that "[i]f the [c]ourt does not grant [F]ather custody, it is in her best interest for the [c]ourt to grant family reunification services so that . . . [F]ather may continue services that will allow him to better parent her." DCFS reports reflect that Father's visits with M.G., which began after January 2020 when he was released from jail, were going well.

On October 21, 2020, the juvenile court summarily denied Father's section 388 petition without a hearing. Father timely appealed.

## DISCUSSION

### A.    *Applicable Law Regarding Section 388 Petitions*

Section 388 permits a party in dependency proceedings, "upon grounds of change of circumstance or new evidence, [to] petition the court . . . for a hearing to change, modify, or set aside any order of court previously made" in those proceedings. (§ 388, subd. (a)(1).) A party seeking such a change in order must show either "that there is new evidence or that there are changed circumstances that make [the proposed] change . . . in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); see *Ansley v. Superior Court* (1986) 185

12

Cal.App.3d 477, 485 [same].)  The change of circumstances or new evidence supporting a section 388 petition "must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court, supra*, at p. 485.)

In order to be entitled to a hearing on a section 388 petition, the petitioner must sufficiently allege both a significant change in circumstances (or new evidence) and the promotion of the child's best interests.  (*In re K.L.* (2016) 248 Cal.App.4th 52, 61; see § 388, subds. (a)(1) & (d); Cal. Rules of Court, rule 5.570(a).)  " 'A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause.  [Citations.]  It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing.  [Citations.]  While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests.' [Citation.]" (*In re K.L., supra*, at pp. 61–62.)  "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.)

The determination of whether to change an existing order is "committed to the sound discretion of the juvenile court, and [its] ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*Stephanie M., supra*, 7 Cal.4th at p. 318.)  Such "discretion is not 'unfettered' but must be ' " 'exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " ' [Citation.]" (*In re Robert L.* (1993)

21 Cal.App.4th 1057, 1067, superseded on other grounds by statute, as stated in *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032.)  An abuse of discretion thus occurs when the juvenile court has exceeded the bounds of reason by making a determination that is arbitrary or capricious in light of the applicable law.  (*In re Robert L., supra,* 21 Cal.App.4th at p. 1066.)

**B.**   ***Father Has Not Made a Prima Facie Showing of a Significant Change in Circumstances***

Father argues that the trial court abused its discretion by denying him a hearing on the third section 388 petition, because the period of sobriety described in the petition constitutes a prima facie showing of the requisite changed circumstances under section 388.  We disagree.

The petition alleges that Father entered a substance abuse program approximately seven months before the petition was filed, during which time he participated in counseling and substance abuse classes.  It further alleges seven months of sobriety as of the date of the petition, and that those working with him in his program view him as committed and sincere in his efforts.  But Father has made exactly these same changes before—indeed, he has in the past achieved longer periods of sobriety (as much as 21 months), participated in counseling and programs for even longer periods, and received glowing reports from his program administrators—only to ultimately relapse after each such period of sobriety and progress.

We do not mean to discount how important it is that Father continue to work on combatting his addiction; nor do we mean to imply that he will again fail.  But when we consider the petition's allegations against a back drop of these repeated failed efforts in

14

the past, it is clear that the allegations do not reflect significant changed circumstances—to the contrary, they reflect more of the same pattern that has persisted for years. Thus, such efforts "[a]re not prima facie evidence of a change in circumstances because Father had already received extensive treatment for his [substance-abuse problem]. That treatment allowed him to achieve a period of sobriety, but it did not prevent him from relapsing" in the past. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642 [no abuse of discretion in denying section 388 petition without hearing], disapproved of by *In re Caden C.* (2021) 11 Cal.5th 614; see *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["[a]ppellant's recent sobriety reflect[ed] 'changing,' not changed, circumstances" where he "ha[d] a history of drug relapses, [was] in the early stages of recovery, and [was] still addressing a chronic substance abuse problem"].) Moreover, in assessing the significance of the change Father claims his recent period of sobriety represents, that seven-month period must be contrasted with his over 30-year history of drug abuse. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531 ["the gravity of the problem leading to the dependency . . . must be taken into account" in assessing a claim of changed circumstances under section 388].) This comparison likewise supports that Father's allegations fall far short of showing the "real reform" warranting relief under section 388. (*Id.* at p. 531, fn. 9; *ibid.* ["[i]t is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 ["seven months of sobriety since [the father's] relapse in January, while commendable, was nothing new" where the father "had a history of drug use dating

15

back to his college days, and since then his periods of sobriety alternated with recurring drug use"].)

Given this pattern and the length of time it has persisted despite significant efforts by Father, the allegations in the petition are also insufficient to establish that the relief Father seeks would be in M.G.'s best interest. He argues that M.G. deserves a chance to be reunited with her biological family, and that she is not interested in nonfamily placements as a permanent plan. After the termination of reunification services, " 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.]" (*Stephanie M., supra,* 7 Cal.4th at p. 317.) Even though "a *parent*'s interest in maintaining a relationship with his or her biological child is no longer the focus," however, we "still consider the benefits to *a child* of remaining connected with his or her biological parent and extended family." (*In re J.M.* (2020) 50 Cal.App.5th 833, 837.) But these benefits must be weighed against their costs: here, delaying permanency for M.G. in the hopes that Father will maintain sobriety and reunify with her, despite the record containing no indication that things will be different this time around and he will achieve this.

Father focuses on how long the dependency proceedings have lasted, leaving M.G. in limbo, and the apparent limits on her options for nonfamily placement, given her behavioral issues. But Father's inability to maintain his sobriety significantly contributed to this situation: M.G. and S.M. were in a potential adoptive home when the juvenile court granted Father's request to reinstate reunification services in 2017, thereby delaying those efforts. Now, Father seeks to reinstate his reunification services

16

when M.G. and S.M. are placed with a foster parent willing to provide both children permanence through legal guardianship. Precisely because of the behavioral challenges affecting M.G.'s placement options, permitting Father to again delay efforts towards this becoming a permanent home is not in her best interest.

Finally, Father argues that section 388 plays an important role as an "escape mechanism" for parents who make changes late in dependency proceedings. This is true, but only when the requirements of section 388 are met—that is, only when the changes the parent makes are sufficient to meet the threshold set by section 388. As discussed above, Father has failed to make a showing that this is the case, even if all the factual allegations in his petition are true. Moreover, Father has already once used this escape mechanism to reinstate reunification services based on a period of sobriety and progress—only to again have services terminated after he relapsed. Denying Father another try when he has made no showing that things will end differently this time is not an abuse of discretion.

17

## DISPOSITION

The juvenile court's order is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



BENDIX, J.



CRANDALL, J.**\***


---

**\*** Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.